Davor Rukavina
State Bar No. 24030781
Thomas D. Berghman
State Bar No. 24082683
Julian Vasek
State Bar No. 24070790
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard St., Suite 4000
Dallas, TX 75201
Telephone: 214.855.7500
Facsimile: 214.855.7584

**PROPOSED ATTORNEYS FOR THE DEBTOR**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **PEGASO ENERGY SERVICES, LLC** | § | **Case No. 24-42429-mxm11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
AUTHORIZING DEBTOR TO (I) MAINTAIN AND CONTINUE TO OPERATE UNDER
FACTORING AND SECURITY AGREEMENT IN ORDER TO SELL ACCOUNTS
POST-PETITION TO DIVERSIFIED LENDERS, INC. PURSUAN TO 11 U.S.C. § 363
(b), (c), (f), AND (m); (II) OBTAIN WORKING CAPITAL FROM DIVERSIFIED
LENDERS, INC. PURSUANT TO 11 U.S.C. § 364(c)(1), (c)(2), & (d)(1); (III) GRANT
DIVERSIFIED LENDERS, INC. ADEQUATE PROTECTION IN THE FORM OF FIRST
PRIORITY LIENS AND SECURITY INTERESTS ON PROPERTY OF THE DEBTOR'S
ESTATE PURSUANT TO 11 U.S.C. §§ 361 AND 363(e); (IV) MODIFY THE
AUTOMATIC STAY; AND (V) GRANT SUCH OTHER RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than July 22, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A virtual hearing will be conducted on this matter on July 22, 2024 at 9:30 a.m. (CT) in Room 128, U.S. Courthouse, 501 W.**

**Tenth Street, Fort Worth, Texas 76102. You may participate in the hearing by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 1.650.479.3207. Video communication will be by the use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Mullin's home page. The meeting code is 2310-650-8783. Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Mullin's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

TO THE HONORABLE MARK X. MULLIN, U.S. Bankruptcy Judge:

NOW COMES, PEGASO ENERGY SERVICES, LLC (the "**the Debtor**"), the Debtor in the above-referenced bankruptcy proceeding (the "**Chapter 11 Case**"), and pursuant to Bankruptcy Rule 4001 files this *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to (I) Maintain and Continue to Operate under Factoring and Security Agreement in Order to Sell Accounts Post-Petition to Diversified Lenders, Inc. Pursuant to 11 U.S.C. § 363(b), (c), (f), and (m); (II) Obtain Working Capital from Diversified Lenders, Inc. Pursuant to 11 U.S.C. § 364(c)(1), (c)(2), & (d)(1); (III) Grant Diversified Lenders Adequate Protection in the Form of First Priority Liens and Security Interests on Property of the Debtor's Estate Pursuant to 11 U.S.C. §§ 361 and 363(e); (IV) Modify the Automatic Stay; and (V) Grant such Other Related Relief* ("**Motion**"). In support, the Debtor would show:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over the Debtor's bankruptcy case and this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), and (M).

2.      Venue of the Debtor's bankruptcy case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.      The Debtor, Pegaso Energy Services, LLC, is a Texas limited liability company. The Debtor's principal place of business is 1311 E. County Road 119, Midland, TX 79706. The company's sole member is IFTK Holdings, LLC, whose manager is John Cole Stout.

4.      The Debtor filed for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 15, 2024 (the "**Petition Date**").  The Debtor, therefore, has the rights, powers and duties of a the Debtor in Possession and continues to hold possession of and desires to maintain and operate its business pursuant to the authority of the Bankruptcy Code set out in §§ 1107 and 1108.

5.      A detailed description of the Debtor and its business, and the facts and circumstances supporting the Motion and the Debtor's Chapter 11 Case, are set forth in greater detail in the *Declaration of Cole Stout in Support of the Debtor's Chapter 11 Petition and First Day Motions* (the "First Day Declaration"), which is incorporated by reference in this Motion.

## FACTORING RELATIONSHIP

6.      To fund the Debtor's operations and assure sufficient working capital, the Debtor entered into a Factoring and Security Agreement dated April 6, 2021 (the "**Factoring Agreement**") with Diversified Lenders, Inc. ("**Diversified**") whereby the Debtor would sell acceptable accounts receivable to Diversified in accordance with the terms set forth in the Factoring Agreement. A true and correct copy of the Factoring Agreement is attached hereto as **Exhibit "A."**

7.      The Factoring Agreement was modified between the Debtor and Diversified on September 30, 2021, and September 9, 2022. True and correct copies of the modifications are attached hereto as **Exhibit "B."** Hereinafter all references to the Factoring Agreement include the modifications.

8.      Pursuant to the Factoring Agreement, the Debtor sold to Diversified acceptable accounts receivable generated from the Debtor's business operations. Diversified purchased the acceptable accounts receivable at face value less the reserve amount and applicable discounts. Upon purchase of the accounts receivable, the "purchased accounts" are assigned to Diversified as owner.

9.      A reserve amount is maintained by Diversified in a Reserve Account established pursuant to the Factoring Agreement. As acceptable accounts receivable are purchased, the Reserve Account fluctuates based on the amount of purchased accounts. Likewise, the Reserve Account fluctuates as payments on purchased accounts are received and additional discounts or fees are earned by Diversified.

10.     As the Reserve Account establishes sufficient amounts of earned reserve, additional funds are released to the Debtor.

11.     As part of the Factoring Agreement, the Debtor covenants to repurchase purchased accounts which have not been collected in more than 90 days or which have been disputed by the account debtors (the "**Repurchase Obligation**").

12.     To secure the Repurchase Obligation and other obligations of the Debtor under the Factoring Agreement, the Debtor granted Diversified a first lien security interest in Collateral, as that term is defined in the Factoring Agreement.

13.     Diversified duly perfected its first priority security interest in the Collateral, as defined in the Factoring Agreement, by filing a UCC-1 Financing Statement with the Texas Secretary of State's Office on April 6, 2021, under Filing No. 21-0013594106. A true and correct copy of the Financing Statement is attached hereto as Exhibit "C."

14.     Diversified and the Debtor have operated under the Factoring Agreement up to and including the Petition Date.

15.     In essence and in summary, post-petition Diversified has agreed to continue to purchase the receivables of the Debtor in the same manner it purchased receivables pre-petition, including requiring the same security and lien rights in the Debtor's assets that it maintained prepetition. To that end, the Debtor and Diversified seek an order that allows the Factoring Agreement to continue post-petition and allows acceptable receivables be sold pursuant to Section 363(b) of the Bankruptcy Code.

16.     In addition, Diversified requires protections under Section 364(c) and (d) of the Bankruptcy Code to protect against any assertion of any other secured creditor in the Collateral. The Debtors are not currently aware of any secured creditor with an interest in the Collateral superior to the interest proposed to be granted to Diversified.

17.     The Debtor and Diversified have agreed to maintain their existing Factoring Agreement as a post-petition agreement and wish to operate on a post-petition basis in accordance with the terms of the Factoring Agreement, and subject to and conditioned upon Bankruptcy Court approval.

18.     To that end, the parties have agreed to enter into that certain *Post-Petition Chapter 11 Bankruptcy Rider to Factoring and Security Agreement* (the "**Rider**"). A true and

correct copy of the Rider is attached hereto as **Exhibit "D"** (the Factoring Agreement and the Rider collectively being the "**Post-Petition Agreements**").

**RELIEF REQUESTED**

19.     Pursuant to the provisions of §§ 363(b), 362, and 364 of the Bankruptcy Code as well as the provisions of Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtor seeks authority to sell acceptable accounts receivable to Diversified, modify the automatic stay so that Diversified can continue to collect on purchased accounts and properly notify account debtors, and grant Diversified post-petition liens to secure the Debtor's obligations under the Post-Petition Agreements as requested herein on an interim basis.

20.     The Debtor further requests that the Court set a final hearing on the Debtor's Motion at least fourteen (14) days after service of the Motion.

***11 U.S.C. § 363***

21.     With respect to the sale component, Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may…sell…other than in the ordinary course of business, property of the estate."  Pursuant to Section 1107 of the Bankruptcy Code, the Debtor, as a debtor-in-possession, "shall have all the rights…, and powers, and shall perform all the functions and duties…, of a trustee serving in a case under this chapter."  Moreover, Section 363(c) of the Bankruptcy Code states, in relevant part, that:

> (1) If the business of the debtor is authorized to be operated under section…1108…of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale…of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

22.     The Debtor cannot operate without factoring its receivables. The Debtor will be unable to generate sufficient cash flow to continue operations without the ability of Diversifed to

acquire the Debtor's accounts receivable. The Debtor has been using factoring to acquire

working capital with Diversified since as early as 2021 and does not otherwise maintain adequate

cash flow to fund its operations on extended terms with its customer base. Absent the Debtor's

ability to continue to sell its accounts receivable to Diversified, the Debtor's operations would

immediately cease.

### *11 U.S.C. § 362*

23.     Section 362(d) allows the Court to modify the stay upon the request of any party

in interest if cause exists. 11 U.S.C. § 362(d)(1). Cause exists for the Court to modify the stay to

allow Diversified to collect on accounts receivable factored pre-petition, to apply the collected

accounts receivable against the obligations of the Debtor under the Factoring Agreement, as

amended by the Rider, regardless if such obligations arose pre- or post-petition, and to allow

Diversified to provide payment notification to account debtors of the Debtor. Without the ability

of Diversified to collect on factored accounts receivable and to apply the collected funds against

the obligations of the Debtor, Diversified will not continue to purchase accounts receivable from

the Debtor, and the Debtor's ability to acquire working capital post-petition will be non-existent.

the Debtor would have to cease operations and shut its doors to the detriment of its creditors and

the Estate.

### *11 U.S.C. § 364*

24.     As to the credit component, Section 364 of the Bankruptcy Code permits courts to

grant creditors senior lien rights in the Debtor's post-petition assets in exchange for extending

necessary post-petition credit. See *In re Futures Equity L.L.C., 2001 Bankr. LEXIS 2229 (Bankr.*

*N.D. Tex. April 11, 2001)*; *In re Barbara K. Enterprises, Inc.*, No. 08-11474 (MG), 2008 Bankr.

LEXIS 1917 at *10 (Bankr. S.D.N.Y. 2008)("To obtain credit…a debtor must prove that (1) the

Debtor cannot obtain credit unencumbered by super-priority status; (2) the credit transaction is necessary to preserve assets of the estate; and (3) the terms of the agreement are fair, reasonable, and adequate."). In pertinent part, Section 364 of the Bankruptcy Code states:

> (c) If the trustee [or the Debtor] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
>> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>>
>> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3) secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
>> (A) the trustee [or the Debtor] is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

"To support a financing request, a debtor should provide evidence of a potential benefit for the estate in obtaining the financing." *In re Barbara K. Enterprises, Inc.*, 2008 Bankr. LEXIS 1917, at *14. Additionally, courts will generally accord significant weight to the necessity of the debtor obtaining post-petition financing in order to remain viable. See *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

25.     In the instant case, the Debtor's ability to continue its operations by receiving working capital from Diversified in the form of advances from purchased accounts is necessary to avoid immediate and irreparable harm to the estate. The Debtor's ability to obtain debtor-in-possession factoring facilities from Diversified will allow the Debtor to continue operating so

that it can continue with this reorganization by proposing a plan to satisfy the claims of creditors. The Debtor has negotiated the best terms available to obtain the funding it needs to maintain sufficient liquidity to preserve its assets over the course of this Chapter 11 Case. The Debtor submits that the circumstances of this Chapter 11 Case require the Debtor to obtain financing under Section 364(c) and (d) of the Bankruptcy Code, as Diversified requires such relief to provide the Post-Petition Agreements. The Debtor has operated pursuant to the Factoring Agreement for years and is simply unable to obtain alternative financing from any other financing company or lender at this juncture. Further, without continued access to factor its receivables under the Post-Petition Agreements, the Debtor will be forced to immediately cease operations, leaving no ability to pay its employees, service its customers, and ultimately repay its creditors.

## INTERIM APPROVAL

26.    The Debtor's ability to continue its operations by receiving working capital from Diversified in the form of Advances is necessary to avoid immediate and irreparable harm to the estate. The Debtor believes that it is essential that the Debtor be permitted to sell its Accounts to Diversified to continue its operations with the good faith expectation that it will achieve a successful reorganization. The Debtor is in the business of operating oil and gas completion and workover rigs, and without steady access to working capital the Debtor will be unable to meet its payroll obligations, pay its employees, fund continuing operations, or otherwise finally sustain its operations. The Debtor has evaluated its short-term financing and cash flow requirements and has reason to believe that the Budget (as defined in the Interim and Final Orders[1]) will be

---

[1] The Budget will be filed separately on the docket as soon as possible and will be available upon request to the undersigned counsel.

adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the Budget.

27.     Notwithstanding the very early stage of the case, the Debtor nonetheless believes that it will be able to successfully reorganize. The Debtor's primary concern is to ensure that its business continues to move ahead as smoothly as possible and without interruption during this Chapter 11 Case. The Debtor's ability to obtain debtor-in-possession factoring facilities via the Post-Petition Agreements will allow the Debtor to continue operating so that it can continue with this reorganization by proposing a plan to satisfy the claims of creditors. The Debtor's ability to convert its accounts into working capital is key to the Debtor's success going forward.

28.     Finally, the Debtor and Diversified jointly seek the protections afforded pursuant to 11 U.S.C. § 363(m) and 11 U.S.C. § 364(e), so that in the event of any reversal or modification on appeal of the Interim Order, no such order shall affect the validity of any debt incurred, or any priority or lien so granted to Diversified, and the Court is requested to find that the extension of credit and the factoring facilities offered, and specifically the Post-Petition Agreements, are being provided in good faith.

**REQUEST FOR FINAL HEARING AND
WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)**

29.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the relief requested herein is essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize. Accordingly, the Debtor submits that ample

cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

30.    The Debtor therefore requests that the Court enter an interim order as soon as possible. The Debtor also requests the Court then set a final hearing at least fourteen (14) days after service of the Motion.

WHEREFORE, PREMISES CONSIDERED, the Debtor prays that the Court set an emergency hearing and determine that such notice and opportunity for hearing is reasonable under the circumstances, and upon hearing of the Motion grant the Debtor authority to continue to operate pursuant to the Post-Petition Agreements, sell acceptable accounts receivable to Diversified, and provide adequate protection to Diversified on an interim basis as set forth in this Motion, and that the Court set a final hearing on the Motion, and the Court grant such other and further relief, at law or in equity, as the Court may deem necessary and proper.

Respectfully Submitted,

/s/  *Julian P. Vasek*
Davor Rukavina
State Bar No. 24030781
Thomas D. Berghman
State Bar No. 24082683
Julian Vasek
State Bar No. 24070790
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard St., Suite 4000
Dallas, TX 75201
Telephone: 214.855.7500
Facsimile:  214.855.7584

**PROPOSED ATTORNEYS FOR THE
DEBTOR**

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that on the 17th and 18th day of July, 2024, I communicated with Brad W. Odell, counsel for Diversified Lenders, regarding the relief requested in this Motion. Mr. Odell stated that Diversified does not object to the relief requested in this Motion.

/s/ *Julian P. Vasek*
Julian P. Vasek

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that separate certificate of service will be filed with respect to all first-day motions.

/s/ *Julian P. Vasek*
Julian P. Vasek

**EXHIBIT A**

| Contract date | Maturity date | Maximum account | Initial Discount | Reserve % | Charge-back term | Funding Amount |
|---|---|---|---|---|---|---|
| April 6, 2021 | October 6, 2021 | $5,000,000 | six hundred seventy-five thousandths percent (0.675%) | fifteen percent (15%) | 90 | eighty-five percent (85%) |

# FACTORING AND SECURITY AGREEMENT

This Factoring and Security Agreement dated April 6, 2021, for purposes of reference is between the undersigned, Pegaso Energy Services, LLC, a Texas limited liability company hereinafter called "CLIENT", and Diversified Lenders, Inc. a Texas corporation hereinafter called "FACTOR".

CLIENT and FACTOR agree as follows:

## SECTION 1. PURPOSE OF AGREEMENT

1.1   CLIENT desires to obtain working capital by selling and assigning to FACTOR acceptable accounts receivable at a discount below face value. This agreement evidences an "account purchase transaction" as defined in Texas Finance Code § 306.001 and such characterization by the parties as a purchase is intended to conclusively establish the transaction as an "account purchase transaction" for purposes of Texas Finance Code § 306.103. This agreement is intended to comply with and be covered under provisions of Texas Business and Commerce Code Article 9 as those statutes relate to the sale of accounts and creation of security interests for the obligations expressed herein.

## SECTION 2. DEFINITIONS

2.1   "ACCEPTABLE ACCOUNT" any right to payment for goods sold or leased or services rendered which is not evidenced by an instrument or chattel paper, that is verified and approved for purchase by FACTOR.

2.2   "ACCOUNT" means any right to payment of a monetary obligation, whether or not earned by performance, for property that has been sold, leased, assigned, or otherwise disposed of or for services rendered, which is not a right to payment evidenced by chattel paper or an instrument.

2.3   "ACCRUED RESERVE" means the reserve account withheld from funding and not yet collected by Factor.

2.4   "ASSIGNEE" means another person or entity to which Accounts may be transferred, sold, or assigned by the FACTOR.

2.5   "CLIENT" means the seller and assignor of the accounts.

2.6   "COLLATERAL" means:  all assets of CLIENT, presently existing and owned, or hereafter acquired, wherever located, including but not limited to all right, title and interest of CLIENT in and to all the following property: a) CLIENT's interest in the reserve account;  b) All present and future accounts and other rights to payment, accounts receivable, notes receivable, chattel paper, documents, bills of lading, dock warrants and receipts, warehouse receipts, contract rights, reserves, reserve accounts, general intangibles, and instruments (including any right to payment for goods sold or services rendered arising out of the sale or delivery of personal property or work done or labor performed by CLIENT), now or hereafter owned, held, or acquired by CLIENT, together with any and all books of account, customer lists and other records relating in any way to the foregoing (including, without limitation, computer software, written on tape, disk, card, strip, cartridge or any form), and in any case where an account arises from the sale of goods, the interest of CLIENT in such goods; all guaranties and other security for all accounts; all right, title and interest of any CLIENT in the goods or services that caused the creation of any account; all chattel paper in which CLIENT is named as secured party, including without limitation, conditional sales agreements, bailment leases, chattel mortgages and security agreements and all documents and instruments held by CLIENT regardless of the transaction which gave rise to the chattel paper, documents or instruments and all proceeds of the chattel paper, documents and instruments; all right, title and interest in the merchandise shall include the right of stoppage in transit of goods, all returned, rejected, rerouted, reclaimed or repossessed goods, the sale or lease of goods that shall have given rise to any account; any rights CLIENT may have against third parties of any goods or services that caused the creation of any account, including all of CLIENT's right as an unpaid vendor or lienor, all rights or stoppage in transit, replevin and reclamation relating thereto, and all rights against third parties with respect thereto; any and all of CLIENT's property that comes into FACTOR's possession or contract may be withheld as security for any such sum due or indebtedness as well as any and all obligations owed to FACTOR regardless of how such obligations arise; c) All present and hereafter acquired goods and inventory, (including without limitation, all raw materials, work in process and finished goods) held, possessed, owned, held on consignment, or held for sale, lease, return or to be furnished under

contracts of services, in whole or in part, by CLIENT wherever located, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form); d) All equipment, presently existing and hereafter acquired, together with all increases, parts, fittings, accessories, special tools, machinery, and accessions now or hereafter attached thereto or used in connection therewith, rolling stock, personal property, furniture, furnishings, and fixtures of whatsoever kind and character now or hereafter possessed, held, acquired, leased or owned by CLIENT and used or usable in CLIENT's business, together with all replacements, accessories, additions, substitutions and accessions to all of the foregoing, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form); e) All now existing or hereafter acquired general intangibles of every kind and nature, tax refunds, all franchise agreements, permits, copyrights, patents, patent applications, trademarks, service marks, trade names, mask works, trade secrets, goodwill, customer lists, licenses, computer software and code, the right to use debtor's name, and all intellectual property owned by CLIENT or used in CLIENT's business; f) All investment property, including but not limited to certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts and financial assets; g) All money, bank accounts and deposits maintained with FACTOR in the name of or for the benefit of CLIENT. The term Collateral, as used herein, shall also include all products and proceeds of all of the foregoing (including, without limitation, insurance payable by reason of loss or damage to the foregoing property) and any property, securities, guaranties or monies of CLIENT which may at any time come into the possession of FACTOR. The designation of proceeds does not authorize CLIENT to sell, transfer or otherwise convey any of the foregoing property except finished goods intended for sale in the ordinary course of CLIENT's business or as otherwise provided herein. Furthermore, FACTOR shall have all of the rights of a secured party with respect to the Collateral under the Uniform Commercial Code and other applicable laws.

2.7     "DEBTOR" means a person or entity obligated on an account.

2.8     "EARNED RESERVE" means the reserve account collected by FACTOR on invoices paid by DEBTORS.

2.9     "INDEBTEDNESS" means all amounts due to FACTOR by CLIENT arising out of the purchase of Accounts by FACTOR pursuant to this agreement.

2.10    "INITIAL DISCOUNT" means the original fee assessed by FACTOR at the time of invoice purchase calculated as a percentage of the face value of each invoice. This charge represents the initial fee to the CLIENT for factoring services.

2.11    "MINIMUM FEE" means the minimum monthly fee due and payable to FACTOR as set forth in Section 4.9 of this agreement.

2.12    "SECURED PARTY" means FACTOR under this Agreement as (a) a person or entity in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding; and (b) a person or entity to which accounts have been sold.

2.13    "WARRANT" means to guarantee, as a material element of this Agreement. Each separate warranty herein is also an independent condition to FACTOR'S duties under this Agreement.

### SECTION 3.  TERM OF AGREEMENT AND TERMINATION OF AGREEMENT

3.1     **Effective Date.**  This Agreement becomes effective when it is accepted and executed by the authorized officers of FACTOR.

3.2     **Termination.**

(a)     This agreement shall continue in effect until October 6, 2021 and shall automatically renew for successive periods of 6 month(s) unless terminated as follows:

(1)     FACTOR may terminate the Agreement at any time for reasonable cause or default;

(2)     CLIENT may terminate the Agreement on October 6, 2021, which will be known hereafter as the Termination Date. CLIENT must submit to FACTOR notice of intent to terminate by certified written notice not less than ninety (90) days prior to the Termination Date, or ninety (90) days prior to the next effective date of termination, should this Agreement be renewed automatically or otherwise for successive six month (6 month) period(s). CLIENT may terminate the Agreement prior to the effective date of termination by providing ninety (90) days notice to FACTOR and a pre-payment fee calculated by multiplying the "minimum fee" stated in section 4.9 of this agreement, times the number of months remaining on the agreement or the sum of the previous 3 months fees, whichever is greater.

(3)    Upon the effective date of termination, whether such termination is pursuant to the occurrence of Default or otherwise, all indebtedness shall become immediately due and payable without notice or demand. No such termination of this Agreement shall affect liabilities and obligations of CLIENT or the rights, powers and remedies of FACTOR under this Agreement or the security interest granted FACTOR hereunder with respect to existing or future collateral, until all indebtedness has been satisfied or paid in full.

(b)    Should CLIENT fail to present to FACTOR acceptable accounts to be purchased within any consecutive two (2) months' time, it may be construed, at FACTOR'S sole discretion, that CLIENT has terminated this relationship with FACTOR. At that time, any and all termination and minimum fee clauses within this Agreement will become applicable.

(c)    After termination, FACTOR continues to have a security interest in the accounts of CLIENT until all accounts purchased have been paid in full and termination fees, if any, have been paid in full.

(d)    In the event CLIENT ceases to sell accounts receivable to FACTOR for whatever reason and/or FACTOR ceases to purchase accounts receivable from CLIENT for whatever reason, FACTOR will forward funds that may be due the CLIENT that are received at the FACTOR'S lock box, to the CLIENT or CLIENT'S agent for no charge for the first 30 days after the CLIENT and FACTOR cease doing business. Thereafter, all funds received at the FACTOR'S lock box will be charged a fee of two percent (2%) for days 31 through 60 and a five percent (5%) fee shall apply from day 61 forward.

(e)    No Lien Termination Without Release. In recognition of Diversified Lenders, Inc. right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by CLIENT, Diversified Lenders, Inc. shall not be required to record any terminations or satisfactions of any of its liens on the Collateral unless and until CLIENT and all guarantors of its obligations have executed and delivered to DIVERSIFIED LENDERS, INC. a general release in the form of Exhibit B hereto. CLIENT understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.

## SECTION 4. PURCHASE AND SALE OF ACCOUNTS; RESERVE ACCOUNT

4.1    **Assignment and Sale:** CLIENT shall from time to time, at CLIENT'S option, sell, transfer and assign accounts to FACTOR and said accounts shall be identified by separate and subsequent written assignments, on a form acceptable to FACTOR or a form to be provided to CLIENT by FACTOR.

4.2    **Purchase Price and Discount:** FACTOR agrees to buy acceptable accounts from CLIENT at the face value of each Account less an initial discount of six hundred seventy-five thousandths percent (0.675%). In addition to the initial discount other fees and/or reserves may be withheld as noted in 4.8 of this agreement.

4.3    **Reserve Account:** FACTOR may reserve and withhold out of sums payable to CLIENT, an amount equal to fifteen percent (15%) of the gross face amount of all accounts purchased. Said reserve may be held by FACTOR and applied by FACTOR against charge-backs or any obligations of CLIENT to FACTOR, and said reserve is not due and payable to CLIENT until any and all potential obligations owing by CLIENT to FACTOR are fully paid and satisfied. CLIENT grants to FACTOR a security interest in this reserve, which secures all obligations and indebtedness arising under this factoring agreement.

4.4    **Notification:** FACTOR, may at any time and at its sole discretion notify any DEBTOR of CLIENT to make payments directly to FACTOR.

4.5    **Approval:** FACTOR will not purchase an account unless such account is first submitted to FACTOR by CLIENT for approval. FACTOR is not obligated to buy any account from CLIENT.

4.6    **Maximum Account:** The outstanding amount in CLIENT'S account with FACTOR (that is, accounts purchased by FACTOR from CLIENT and not yet paid by Debtor) shall not exceed the sum of $5,000,000, except FACTOR may purchase additional accounts from or advance additional sums to CLIENT as FACTOR may, from time to time, at FACTOR'S sole discretion determine.

4.7    **Monthly Volume:** In consideration of the Maximum Account in section 4.6 CLIENT agrees to sell FACTOR a monthly minimum of $250,000 in acceptable accounts for the term(s) of the Factoring and Security Agreement.

4.8    **Funding, Discounts and Reserve:** It is agreed between CLIENT and FACTOR that FACTOR will fund eighty-five percent (85%) of the face value of each invoice. At the time of purchase FACTOR will deduct the initial discount and the reserve as stated in Sections 4.2 and 4.3 hereof. Additional discounts will be

taken by FACTOR from the reserve account as described in this section. Additional reserve may be taken when deemed necessary by FACTOR.

(a)     *Additional Discount:* FACTOR will retain and pay to itself, from the reserve account, an additional discount calculated by taking six hundred seventy-five thousandths percent (0.675%) of the face value of each invoice every 30 day period, or fraction thereof, from the 30th day the invoice is dated and is subsequently paid by the DEBTOR, charged back, repurchased or otherwise settled by CLIENT in full. Should the reserve account be inadequate, FACTOR may deduct these additional charges from the purchase of new invoices or bill CLIENT directly for the amounts due.

(b)     *Check Clearing:* FACTOR will add to the payment posting date two (2) days for in-state checks and five (5) days for out-of-state checks.

(c)     *Earned Reserve Release:* A release of monies in the reserve account will be made by FACTOR to CLIENT on Wednesdays. Reserve Releases are made only on invoices that are paid by DEBTOR, charged back, repurchased or otherwise settled by CLIENT in full, unless there are outstanding obligations owing by CLIENT to FACTOR. Reserve releases are subjected to the computer closing date for that period.

(d)     *Daily Discount:* FACTOR will retain and pay to itself, from the reserve account, a daily discount calculated by taking a daily rate equal to the prime rate published in the Wall Street Journal Prime plus six hundred seventy-five hundredths percent (6.75%) floating floored at ten percent (10%) on the invoiced amount from the day the invoice is purchased and is subsequently paid by the Debtor, charged back, repurchased or otherwise settled by CLIENT in full. Should the reserve account be inadequate, FACTOR may deduct these additional charges from the purchase of new invoices or bill CLIENT directly for the amount due.

4.9     Monthly Fees: CLIENT agrees to generate a minimum fee to FACTOR of $1,688 per month for the term of this Agreement. Should CLIENT fail to meet the monthly minimum fees due FACTOR, CLIENT agrees to remit to FACTOR the difference between the $1,688 monthly minimum and the amount generated through factoring. Payment will be made to FACTOR by either deducting the amount from CLIENT'S Schedule of Accounts, Reserve Release or by requesting payment from CLIENT directly.

4.10     Minimum Fee Per Invoice: In the event the INITIAL DISCOUNT charged for any one invoice results in a charge of less than $2.00, then the minimum invoice fee shall be $2.00.

4.11     Concentration: FACTOR reserves the right to not purchase invoices on ACCOUNT DEBTORS who represent more than 25% of the total outstanding balance.

### SECTION 5. OPERATION OF THE PROGRAM

5.1     Power of Attorney: In order to carry out this Agreement and avoid unnecessary notification of DEBTOR'S, CLIENT irrevocably appoints FACTOR, or any person designated by FACTOR, its special attorney in fact, or agent, with power of substitution, and with power to:

(a)     strike out CLIENT'S address on all accounts mailed to DEBTORS and put on FACTOR'S address.

(b)     receive, open and dispose of all mail addressed to CLIENT or to CLIENT'S trade name via FACTOR'S address.

(c)     endorse the name of CLIENT or CLIENT'S trade name on any checks or other evidences of payment that may come into the possession of FACTOR on accounts purchased by FACTOR or pursuant to default and on any other documents relating to any of the Accounts or to collateral.

(d)     in CLIENT'S name, or otherwise, demand, sue for, collect, and give releases for any and all monies due or to become due on Accounts.

(e)     compromise, prosecute, or defend any action, claim or proceeding as to said Accounts.

(f)     sell in whole or in part for cash, credit or property to others or to itself at any public or private sale, assign, make any agreement with respect to or otherwise deal with any of the Collateral.

(g)     from time to time offer a trade discount to CLIENT'S normal business custom with DEBTOR.

(h)     to notify, orally and in writing, any of CLIENT'S secured or unsecured creditors (including all trade creditors), any banking institution with which FACTOR believes CLIENT does have or may have established a relationship, of, *inter alia*, CLIENT'S default, or of FACTOR's' sole right

to the possession of its collateral and all proceeds, and to demand turnover of same, and CLIENT will hold FACTOR harmless from any claims or damages of any kind that might arise for having done so.

(i)    do any and all things necessary and proper to carry out the purpose intended by this Agreement.

The authority granted FACTOR shall remain in full force and effect until all assigned accounts are paid in full and any indebtedness of CLIENT to FACTOR is discharged.

5.2    **Double Payments:** Should FACTOR receive a double payment on an account or other payment which is not identified, FACTOR shall carry these sums as open items and shall return them to said Payer upon proper identification. After six months following receipt of such payments, FACTOR may, if it so elects, consider such payments or unidentified items as credits towards any outstanding or indebtedness of CLIENT. CLIENT will hold FACTOR harmless from any action brought by CLIENT or DEBTOR for misapplication of double payments.

5.3    **Payment of Disputed Account:** CLIENT will immediately pay to FACTOR the full amount of any account subject to a dispute of any kind whatsoever.

5.4    **Charge Back:** If CLIENT does not fully settle the dispute with immediacy, FACTOR may, in addition to any other remedies under this Agreement, charge or sell back the account to CLIENT.

5.5    **Charge Back for Invoicing Error:** Mistaken, incorrect and/or erroneous invoicing submitted by CLIENT to FACTOR may at FACTOR'S discretion be deemed a disputed invoice and be charged-back to CLIENT.

## SECTION 6.  PROCEDURES AND FORMS

6.1    **Required Forms:** When CLIENT offers a Schedule of Accounts to FACTOR for sale, FACTOR shall receive an original invoice together with one copy thereof, a copy of the Bill of Lading, work ticket, shipping document, or proof of delivery, Contract or Purchase Order, and/or a Purchase Order number which corresponds with said invoice(s) or other documents and forms necessary for payment from DEBTOR, as appropriate to the business of CLIENT.

6.2    **Financial Records:** CLIENT agrees to keep proper books of account showing all sales, claims and allowances on merchandise and such books and reports shall be open to FACTOR'S inspection. CLIENT agrees to provide financial statements including a balance sheet, profit and loss statement and tax returns within 90 days after fiscal year end and at other times as may be reasonably requested by FACTOR.

6.3    **Tax Compliance:** CLIENT will furnish FACTOR, upon request, satisfactory proof of payment and/or compliance with all Federal, State and/or Local tax requirements. CLIENT will execute IRS form 8821 or other forms which allow FACTOR to be notified of any tax liens or other action filed against CLIENT.

## SECTION 7.  REASSIGNMENT OF ACCOUNTS; SECURITY INTEREST

7.1    **Repurchase:** CLIENT will repurchase from FACTOR any and all Accounts not paid within 90 days from invoice date at one hundred percent (100%) of the face value in one of the following manners or combination thereof at FACTOR'S option: (1) by submitting new acceptable invoices, (2) by deducting amount from the Earned Reserve due CLIENT, (3) by requesting payment from CLIENT. All short payments, discounts and any other obligations CLIENT may have to FACTOR will be deducted in the same manner.

## SECTION 8.  REPRESENTATIONS, WARRANTIES AND COVENANTS

8.1    **Representations, Warranties and Covenants:** As an inducement for FACTOR to enter into this Agreement, and with full knowledge that the truth and accuracy of the warranties in this Agreement are being relied upon by FACTOR instead of the delay of a complete credit investigation, CLIENT warrants and/or covenants that:

(a)    CLIENT is properly licensed and authorized to operate the business, and CLIENT'S trade name, if any, has been properly filed and published as required by the laws of the State of Texas.

(b)    CLIENT'S business is solvent.

(c)    Each DEBTOR'S business is solvent to the best of CLIENT'S information and knowledge.

(d)    CLIENT is, at the time of purchase by FACTOR, the lawful owner of and has good and undisputed title to the accounts purchased by FACTOR.

(e)    Each account offered for sale to FACTOR is an accurate and undisputed statement of indebtedness of DEBTOR to CLIENT for a sum certain which is due and payable in thirty days or

less or on such other terms, as are acceptable to FACTOR in its discretion, which are expressly set forth on the face of all invoices.

(f)     Each account offered for sale to FACTOR is an accurate statement of a bona fide sale, delivery and acceptance of merchandise or performance or service by CLIENT to DEBTOR.

(g)     CLIENT does not own, control or exercise dominion over, in any way whatsoever, the business of any account to be sold by CLIENT to FACTOR.

(h)     All financial records, statements, books, or other documents shown to FACTOR by CLIENT at any time, either before or after the signing of this Agreement are true and accurate.

(i)     CLIENT will not, under any circumstances or in any manner whatsoever, interfere with any of FACTOR'S rights under this Agreement.

(j)     CLIENT will not factor or sell accounts except to FACTOR for the period of this Agreement.

(k)     CLIENT will not transfer, pledge or give a security interest in any of its accounts to any other party.

(l)     CLIENT will not change or modify the terms of the original account with DEBTOR unless FACTOR first consents to such change in writing. For example, CLIENT may not extend credit to a DEBTOR beyond thirty days without prior written consent from FACTOR.

(m)     CLIENT will notify FACTOR in writing prior to any change in CLIENT'S place of business or, if CLIENT has or acquires more than one place of business, or prior to any change of CLIENT'S chief executive office, the office or offices where CLIENT'S books and records concerning accounts receivable are kept.

(n)     CLIENT will immediately notify FACTOR of any proposed or actual change of CLIENT'S name, location, identity, legal entity or corporate structure.

(o)     CLIENT will, when requested by FACTOR, execute any written instruments and do any other things necessary to effectuate more fully the purposes and provisions of this Agreement, including without limitations, executing and filing financing statements in form and substance satisfactory to FACTOR.

(p)     All of the Collateral is owned by CLIENT alone, free and clear of all liens, claims, security interest(s) or encumbrances except those granted to FACTOR or those specifically disclosed in writing to FACTOR.

(q)     CLIENT has filed when due all tax reports and returns in connection with and in respect of CLIENT's business, assets and employees, and has timely paid and discharged all tax obligations shown thereon.

### SECTION 9. DEFAULT

9.1     Defaults: Any one or more of the following shall be a default hereunder:

(a)     CLIENT or any person which is a guarantor of CLIENT shall fail to pay any indebtedness to FACTOR when due.

(b)     CLIENT shall breach any term, provision, covenant, warranty or representation under this Agreement, or under any other agreements or contracts between CLIENT and FACTOR or obligation of CLIENT to FACTOR whether or not related to Factoring and Security Agreement.

(c)     the appointment of any receiver or trustee of all or a substantial portion of the assets of CLIENT.

(d)     CLIENT shall become insolvent or unable to pay debts as they mature, shall make a general assignment for the benefit of creditors or shall voluntarily file under any bankruptcy or similar law.

(e)     any involuntary petition in bankruptcy shall be filed against CLIENT.

(f)     any levies of attachment, executions, tax assessments or similar process shall be issued against the Collateral.

(g)     any financial statements, profit and loss statements, schedules, or other statements furnished by CLIENT to FACTOR prove false or incorrect in any material respect.

9.2     **Remedies after Default:**  In the event of any default FACTOR may do any one or more of the following:

    (a)     declare any indebtedness secured hereby immediately due and payable.

    (b)     notify any DEBTOR'S and take possession of Collateral and collect any receivables without judicial process.

    (c)     require CLIENT to assemble the Collateral and collect any receivables without prior notice to CLIENT.

    (d)     enter the premises of CLIENT and take possession of the records pertaining to the receivables and any other Collateral.

    (e)     grant extensions, compromise claims and settle receivables for less than face value, all without prior notice to CLIENT.

    (f)     use, in connection with any assembly or disposition of the Collateral, any trademark, trade name, trade style, copyright, patent right or technical process used or utilized by CLIENT.

    (g)     return any surplus realized to CLIENT after deducting the reasonable expenses, attorney's fees incurred by FACTOR in resolving said default.

    (h)     hold CLIENT liable for any deficiency.

## SECTION 10. APPLICABLE LAW

10.1     **Governing Law; Venue; Service of Process.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas and the applicable laws of the United States of America. This Agreement has been entered into in Lubbock County, Texas, and it shall be performable for all purposes in Lubbock County, Texas.  Any action or proceeding by or against the CLIENT under or in connection with this Agreement shall be brought only in any state or federal court in Lubbock County, Texas.  CLIENT hereby irrevocably (a) submits to the jurisdiction of such courts, and (b) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any such court or that any such court is an inconvenient forum.  CLIENT agrees that service of process upon it may be made by certified or registered mail, return receipt requested, at its address specified in this Agreement.  Nothing herein or in any of the other documents shall affect the right of FACTOR to serve process in any other manner permitted by law.  Any action or proceeding by CLIENT against FACTOR shall be brought only in a court located in Lubbock County, Texas.

10.2     **Waiver of Jury Trial.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO. IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTIONS SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PART TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

## SECTION 11. GENERAL PROVISIONS

11.1     **Notice of Dispute:** CLIENT must immediately notify FACTOR of any disputes between DEBTOR and CLIENT.

11.2     **Settlement of Dispute:** FACTOR may settle any dispute directly with DEBTOR.  Such settlement does not relieve CLIENT of final responsibility for payment of such account.

11.3     **Disposal of Documents:** CLIENT authorizes FACTOR in its sole discretion to dispose of any documents, schedules, invoices or other papers delivered to FACTOR in connection with this Agreement, at any time at least six (6) months after they have been delivered to FACTOR.

11.4     **Book Entry:** CLIENT will immediately upon sale of accounts to FACTOR, make proper entries on its books and records disclosing the absolute sale of said accounts to FACTOR.

11.5 **Legal Fees:** The CLIENT will pay any and all legal expenses and reasonable attorney's fees that may incur as a result of FACTOR enforcing this Agreement.

11.6 **Hold Harmless:** CLIENT shall hold FACTOR harmless against any DEBTOR'S ill will arising from FACTOR'S collecting or attempting to collect any accounts.

11.7 **Binding on Future Parties:** This Agreement inures to the benefit of and is binding upon the heirs, executors, administrators, successors and assigns of the parties to it.

11.8 **Cumulative Rights:** All rights, remedies and powers granted to FACTOR in this Agreement, or in any note, lease or other agreement given by CLIENT to FACTOR, are cumulative and may be exercised from time to time as to all or any part of the pledged Collateral as FACTOR in its discretion may determine.

11.9 **Written Waiver:** FACTOR may not waive its rights and remedies unless the waiver is in writing and signed by FACTOR. A waiver by FACTOR of a right or remedy under this Agreement on one occasion is not a waiver of the right or remedy on any subsequent occasion.

11.10 **Invalid Provisions:** If any provision of this Agreement shall be declared illegal or contrary to law, it is agreed that such provision shall be disregarded and this Agreement shall continue in force as though such provision had not been incorporated herein.

11.11 **Entire Agreement:** This instrument contains the entire Agreement between the parties. Any addendum or modification hereto will be signed by both parties and attached hereto.

11.12 **Right of Stoppage:** The right of stoppage in transit on all shipments of sales on all accounts assigned or to be assigned to FACTOR is reserved to FACTOR. On FACTOR'S request, CLIENT agrees to stop any delivery of goods or services on its accounts, to assert its purchase money lien in favor of FACTOR or to take such other actions in connection with its accounts to preserve, perfect and protect FACTOR'S rights. Any merchandise returned by reclaim, exercise of purchase money lien or under the right reserved in this section shall be considered returned goods.

11.13 **Assignment of Contract:** FACTOR may, without notice to CLIENT, assign or transfer this agreement including all accounts purchased, reserve accounts and other sums due factor, and in such event FACTOR'S assignee or transferee shall have the rights, power, privileges and remedies of FACTOR hereunder.

## SECTION 12. SPECIAL PROVISIONS

12.1 **Further Promises:** SECURITY INTEREST/COLLATERAL: As a further inducement to FACTOR to enter into this Agreement, CLIENT hereby grants to FACTOR as Collateral for the repayment of any and all its obligations and liability whatsoever of CLIENT to FACTOR a Security Interest in the Collateral.

12.2 CLIENT hereby appoints and empowers FACTOR , or any employee of FACTOR which FACTOR may designate for the purpose, as its attorney-in-fact, to execute and/or endorse (and file, as appropriate) on its behalf any documents, agreements, papers, checks, UCC financing statements and other documents which, in FACTOR'S sole judgment, are necessary to be executed, endorsed and/or filed in order to (i) perfect or preserve the perfection and priority of FACTOR'S security interests granted hereby and (ii) collect or realize upon the Collateral or otherwise exercise its rights and remedies under this Agreement or applicable law.

12.3 **Notice of Levy:** CLIENT will promptly notify FACTOR of any attachment or any other legal process levied against CLIENT or any of CLIENT'S DEBTORS known to CLIENT.

12.4 **No Pledge:** CLIENT will not pledge the credit of FACTOR to any person or business for any purpose whatsoever. CLIENT shall neither authorize nor permit any person or entity to exercise or exert control over CLIENT'S deposit accounts nor permit any person or entity to electronically debit CLIENT's accounts in connection with what is commonly referred to as a cash advance lending relationship, including the use of any deposit account cash advance.

12.5 **Sole Property:** Once FACTOR has purchased an account, the payment from DEBTOR, as to that account, is the sole property of FACTOR. Any interference by CLIENT with this payment may result in civil and/or criminal liability.

12.6 **Hold in Trust:** CLIENT agrees that even though FACTOR shall use best efforts to notify all DEBTORS of CLIENT of the Factoring and Security Agreement by CLIENT to FACTOR of certain accounts, some payments may be sent directly to CLIENT, which are the sole and exclusive property of FACTOR. In such circumstances, CLIENT promises not to negotiate said check or other forms of payment, but to hold in trust and safekeeping for the benefit of FACTOR and turn over to FACTOR

the exact form of payment received. That is, CLIENT agrees to turn over to FACTOR immediately in kind any such check or other form of payment(s) which are property of FACTOR.

In the event CLIENT receives such a check or other payment owning to FACTOR, but some portion of said payment is owing to CLIENT, CLIENT still agrees to turn over said payment in kind to FACTOR, and FACTOR will remit to CLIENT along with any earned reserve, CLIENT's portion thereof, unless CLIENT is indebted to or in default with FACTOR.

CLIENT acknowledges that he has been notified by FACTOR of the potential civil and/or criminal liability for failure to fully comply herewith, and that the cashing, depositing and/or negotiation of any payment which is the property of FACTOR could result in civil and/or criminal liability and remedies attendant thereto. If an employee or other representative of CLIENT negotiates such a check payment without CLIENT's direct knowledge, CLIENT can still be held liable for acts of CLIENT's employees, agents or servants.

CLIENT further acknowledges that he has been notified by FACTOR that indebtedness by CLIENT to FACTOR arising under circumstances as described herein above may constitute a debt, which may not be discharged in a Court of Bankruptcy. The conversion of check payments can be deemed an intentional act even though CLIENT did not specifically intend to take or convert said payments and/or damage FACTOR.

Should CLIENT receive and deposit or otherwise convert into cash, payments from any DEBTOR for which such payment was due FACTOR, CLIENT may be held liable for civil and/or criminal remedies to the extent provided by law. FACTOR may also charge a processing fee equal to 25% of the amount of the payment converted into cash. The enforcement or non-enforcement of this provision shall not be considered a waiver of any other remedy of default, nor shall it be construed a precedent for future discretionary actions available to FACTOR.

CLIENT initials: _____ (I acknowledge that I have read and understand paragraph 12.6)

### SECTION 13. INDEMNIFICATION

13.1   CLIENT AGREES TO INDEMNIFY AND HOLD FACTOR HARMLESS FROM ANY CLAIM OR LIABILITY FACTOR MAY SUSTAIN BY VIRTUE OF OR ARISING OUT OF ANY ACTION BY CLIENT, DIRECTLY OR INDIRECTLY, WHICH IS DETERMINED TO BE IN VIOLATION OF ANY DEBT COLLECTION PRACTICES LAWS OR REGULATIONS UNDER APPLICABLE STATE OR FEDERAL LAW.

13.2   CLIENT AGREES TO INDEMNIFY AND HOLD FACTOR HARMLESS FROM ANY CLAIM OR LIABILITY SUSTAINED BY VIRTUE OF ACTING IN RELIANCE ON THE DATA THAT CLIENT SUPPLIES TO FACTOR. CLIENT AGREES TO INDEMNIFY AND HOLD FACTOR HARMLESS FROM ANY CLAIM OR LIABILITY FACTOR MAY SUSTAIN BY VIRTUE OF ACTING IN RELIANCE ON CLIENT'S OBLIGATION TO OBTAIN OR MAINTAIN WRITTEN CREDIT AGREEMENTS WITH CLIENT'S DEBTOR'S OR TO PROVIDE ANY DISCLOSURE REQUIRED UNDER APPLICABLE STATE OR FEDERAL LAW.

Executed and accepted this ___ day of _April_, _2021_ at Lubbock, Texas.

CLIENT:
Pegaso Energy Services, LLC, a Texas Limited
Liability Company
1311 E. County Road 119
Midland, Texas 79706

By IFTK Holdings, LLC, a Delaware
Limited Liability Company, its Manager

By: _____
      John Cole Stout, Manager

By: _____
      Ashley Baxter Stout, Manager

FACTOR:
Diversified Lenders, Inc.
5607 S. Avenue Q
Lubbock, TX 79412

By: _____
      Cole Roberts, Vice President

# **EXHIBIT B**

## MODIFICATION OF FACTORING AND SECURITY AGREEMENT

Modification to Factoring and Security Agreement (Agreement) by and between Diversified Lenders, Inc. (DivLend), and Pegaso Energy Services, LLC.

WHEREAS, heretofore Pegaso Energy Services, LLC made, executed and delivered to DivLend one certain Factoring and Security Agreement dated April 6, 2021.

WHEREAS, it is mutually desirable, beneficial and agreeable to the parties hereto that the terms of said Agreement be modified as hereinafter set out:

NOW, THEREFORE, in consideration of the mutual benefits inuring to each other, it is understood and agreed, by and between the parties hereto, that the terms and conditions of said Agreement, as above described, are hereby modified as follows:

**4.8  Funding, Discounts and Reserve:**

(d)      Daily Discount: FACTOR will retain and pay to itself, from the reserve account, a daily discount calculated by taking a daily rate equal to the prime rate published in the Wall Street Journal Prime plus one and seventy-five hundredths percent (1.75%) floating floored at five percent (5%) on the invoiced amount from the day the invoice is purchased and is subsequently paid by the Debtor, charged back, repurchased or otherwise settled by CLIENT in full.  Should the reserve account be inadequate, FACTOR may deduct these additional charges from the purchase of new invoices or bill CLIENT directly for the amount due.

It is further understood and agreed that all other terms, conditions and covenants of the aforesaid Agreement, not otherwise modified hereby, shall be and remain the same, and that this Modification, when executed by the parties hereto, shall be attached to and become a part of the original Agreement, and shall have the same force and effect as if the terms and conditions hereof were originally incorporated in the Agreement, prior to its execution.

IN WITNESS WHEREOF, the undersigned parties as of the 30th day of September, 202ʹ execute this Modification.

Diversified Lenders, Inc.

By: Cole Roberts, Vice President

Pegaso Energy Services, LLC

By IFTK Holdings, LLC, a Delaware
Limited Liability Company, its Manager

By: _____
John Cole Stout, Manager

By: _____
Ashley Baxter Stout, Manager

## MODIFICATION OF FACTORING AND SECURITY AGREEMENT

This Modification to Factoring and Security Agreement ("Modification") is dated May 24, 2022, and is executed by and between Diversified Lenders, Inc. ("DivLend"), a Texas corporation, and Pegaso Energy Services, LLC, a Louisiana limited liability company.

### Recitals

WHEREAS, Pegaso Energy Services, LLC made, executed and delivered to DivLend that certain Factoring and Security Agreement ("Factoring Agreement") dated April 6, 2021.

WHEREAS, it is mutually desirable, beneficial and agreeable to the parties hereto that the terms of said Factoring Agreement be modified as hereinafter set out.

NOW, THEREFORE, in consideration of the mutual benefits inuring to each other, it is understood and agreed, by and between the parties hereto, that the terms and conditions of said Factoring Agreement, as above described, are hereby modified as follows:

4.3   **Reserve Account:** FACTOR may reserve and withhold out of sums payable to CLIENT, an amount equal to ten percent (10%) of the gross face amount of all accounts purchased. Said reserve may be held by FACTOR and applied by FACTOR against charge-backs or any obligations of CLIENT to FACTOR, and said reserve is not due and payable to CLIENT until any and all potential obligations owing by CLIENT to FACTOR are fully paid and satisfied. CLIENT grants to FACTOR a security interest in this reserve, which secures all obligations and indebtedness arising under this factoring agreement.

4.8   **Funding, Discounts and Reserve:** It is agreed between CLIENT and FACTOR that FACTOR will fund ninety percent (90%) of the face value of each invoice. At the time of purchase FACTOR will deduct the initial discount and the reserve as stated in Sections 4.2 and 4.3 hereof. Additional discounts will be taken by FACTOR from the reserve account as described in this section. Additional reserve may be taken when deemed necessary by FACTOR.

It is further understood and agreed that all other terms, conditions and covenants of the aforesaid Factoring Agreement, not otherwise modified hereby, shall be and remain the same, and that this Modification, when executed by the parties hereto, shall be attached to and become a part of the Factoring Agreement, and shall have the same force and effect as if the terms and conditions hereof were originally incorporated in the Agreement, prior to its execution.

IN WITNESS WHEREOF, the undersigned parties as of the 9 day of September, 2022 execute this Modification.

Diversified Lenders, Inc.

By: Cole Roberts, Vice President

Pegaso Energy Services, LLC

By IFTK Holdings, LLC, a Delaware

Limited Liability Company, its Manager

By: J. Cole Stout
John Cole Stout, Manager

By:
Ashley Baxter Stout, Manager

## **EXHIBIT C**

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Lien Solutions | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

\*\*CT Lien Solutions
2929 Allen Parkway, Ste. 3300
Houston, TX 77019
USA

**FILING NUMBER:** 21-0013594106
**FILING DATE:** 04/06/2021    01:48 PM
**DOCUMENT NUMBER:** 1040577740001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| **OR** | **PEGASO ENERGY SERVICES, LLC** | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1311 E. County Road 119** | **Midland** | **TX** | **79706** | **USA** |

2. DEBTOR'S NAME - Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| **OR** | **IFTK Holdings, LLC** | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1311 E. County Road** | **Midland** | **TX** | **79706** | **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only <u>one</u> Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| **OR** | **C T CORPORATION SYSTEM, AS REPRESENTATIVE** | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **330 N Brand Blvd, Suite 700; Attn: SPRS** | **Glendale** | **CA** | **91203** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, presently existing and owned, or hereafter acquired,
wherever located, including but not limited to all right, title and interest of
Client in and to all the following property: all of Debtor's presently existing
and hereafter acquired accounts, accounts receivable, notes receivable,
instruments, contract rights, equipment, goods, inventory, chattel paper,
documents, investment property, deposit accounts and general intangibles and all
returned, repossessed and reclaimed goods, books, records, computer programs
and tapes, files, documents relating to accounts, and all title and interest in
goods represented by accounts, all of Debtor's rights as an unpaid vendor or
lienor, all rights of stoppage in transit, replevin and reclamation relating
thereto, and all rights against third parties with respect thereto. Notice -
Pursuant to an agreement between Debtor and secured party, Debtor has agreed not
to grant a security interest in the collateral, described herein and in any
future commercial tort claims to any other secured party. Accordingly, the
acceptance of any such security interest by anyone other than the above secured
party will constitute the tortious interference with secured party's rights. In
the event that any entity is granted a security interest in Debtor's accounts,
chattel paper or general intangibles contrary to the above, the secured party
asserts a claim to any proceeds thereof received by such entity.

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

# **EXHIBIT D**

## POST-PETITION CHAPTER 11 BANKRUPTCY RIDER TO
## <u>FACTORING AND SECURITY AGREEMENT</u>

This Post-Petition Chapter 11 Bankruptcy Rider to Factoring and Security Agreement (hereinafter referred to as "**Bankruptcy Rider**") is made and entered into effective the day of \_\_, 2024, by and between the Chapter 11 Debtor and Debtor-In-Possession, Pegaso Energy Services, LLC (hereinafter referred to as the "**Debtor**" or "**Client**") and Diversified Lenders, Inc. ("**Company**"), a Texas corporation.

## RECITALS:

1.      The Debtor is a Debtor-In-Possession in the Chapter 11 bankruptcy case currently pending in the United States Bankruptcy Court for the Northern District of Texas, Chapter 11 Case No. 24-42429-mxm11 (hereinafter "**Bankruptcy Case**" or "**Bankruptcy Court**"). The Bankruptcy Case was filed on or about July 15, 2024 ("**Petition Date**").

2.      Client and Company have entered into and desire to continue to operate under, post-petition and subject to approval by the Bankruptcy Court, a Factoring and Security Agreement dated April 9, 2021 and any other related documents entered or to be entered into between Company and Client, which shall be collectively referred to as "**Post-Petition Agreements**" and this Bankruptcy Rider may be referenced separately.[1]

3.      Company asserts that on or about April 9, 2021, Company duly perfected its ownership interest in the Debtor's Accounts and its first priority security interest in the Debtor's Collateral, including, without limitation, all non-purchased accounts by causing a UCC-1 Financing Statement to be filed with the Texas Secretary of State naming the Debtors, bearing filing number 26-0013594106.

4.      The Debtor is and remains authorized to operate the Debtor's business under and in accordance with 11 U.S.C. §§ 1107(a) and 1108, and Debtor and Company intend to operate, post-petition, under the Factoring and Security Agreement subject to this Post-Petition Chapter 11 Bankruptcy Rider to Factoring and Security Agreement and the entry of a Bankruptcy Court Order granting the Debtors' Motion to be entitled, "Debtor's Emergency Motion for Interim and Final Orders Authorizing Debtor to (I) Maintain and Continue to Operate under Factoring and Security Agreement in Order to Sell Accounts Post-Petition to Diversified Lenders, Inc. Pursuant to 11 U.S.C. § 363(b), (c), (f), and (m); (II) Obtain Working Capital from Diversified Lenders, Inc. Pursuant to 11 U.S.C. § 364(c)(1), (c)(2), & (d)(1); (III) Grant Diversified Lenders Adequate Protection in the Form of First Priority Liens and Security Interests on Property of the Debtor's Estate Pursuant to 11 U.S.C. §§ 361 and 363(e); (IV) Modify the Automatic Stay; and (V) Grant such Other Related Relief"

5.      The Debtor affirms and ratifies the validity and accuracy of the proposed findings of fact contained in the Proposed Interim and Final Orders, attached hereto as **Exhibit "1."**

---

[1] The Post-Petition Bankruptcy Rider to Factoring and Security Agreement may or may not have been signed prior to approval of this Rider by the Bankruptcy Court.

## <u>AGREEMENT</u>

Now, therefore, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     The foregoing recitals shall be deemed a part of this Bankruptcy Rider for all purposes and are acknowledged by the Debtor as being true and correct.

2.     The parties' operation under the Post-Petition Agreements, including this Bankruptcy Rider, shall be conditioned upon and subject to the entry of the Bankruptcy Court's Proposed Interim and Final Order in a form satisfactory to Company. Debtor acknowledges that if the Proposed Interim and Final Orders are approved by the Bankruptcy Court, it shall be Debtor's obligation to have a copy of the Proposed Interim and Final Orders duly served on all parties-in-interest pursuant to the Federal Rules of Bankruptcy Procedure, including Rule 4001(d), and all applicable local rules and requirements in respect thereto.

3.     Debtor acknowledges that this Bankruptcy Rider is the product of joint negotiations between the parties hereto and represents the jointly conceived, bargained-for and agreed upon language mutually determined by the parties to express their intention in entering into this Bankruptcy Rider. Any ambiguity or uncertainty in this Bankruptcy Rider shall be deemed to be caused by, or attributable to, all parties hereto collectively. In any action or proceeding to enforce or interpret this Bankruptcy Rider, the Bankruptcy Rider shall be construed in a neutral manner, and no term or condition of this Bankruptcy Rider, or the Bankruptcy Rider as a whole, shall be construed more or less favorably to any one party, or group of parties, to this Bankruptcy Rider.

4.     Debtor acknowledges that there is no basis to assert and Debtor shall be deemed to have waived any right to contest: (a) Company's ownership rights in the prepetition and/or post-petition Acceptable Accounts (as defined in the Factoring Agreement) that have been sold to Company, (b) the Debtor's prepetition Obligations to Company that arose before the commencement of the Bankruptcy Case (i.e. Company's allowed fully secured pre-petition claim), (c) or otherwise seek to prevent or impair Company's rights to retain payment on all such prepetition and post-petition Acceptable Accounts, (d) the validity, enforceability, priority of the liens and security interest granted to Company in the Debtor's Collateral, including non-purchased accounts, (e) or otherwise assert against Company any of the avoiding powers under the Bankruptcy Code, including those powers that may arise under Bankruptcy Code §§ 544 through 552.

5.     The terms and conditions of the Post-Petition Agreements, this Rider and the Proposed Interim and Final Orders shall control the terms of any plan of reorganization ("**Plan**") that may be filed with the Bankruptcy Court in respect to Company and submitted for confirmation by the Bankruptcy Court, and the terms and protections afforded Company in the Post-Petition Agreements, this Rider and the Proposed Interim and Final Orders may not be varied, altered or modified by any proposed Plan without Company's express written consent, and may not vary, alter or modify any rights that Company has against any guarantor or secondarily liable party, and the filing of any Plan in contradiction to these provisions shall be deemed to have filed in violation of 11 U.S.C. § 1129(a)(1) and (3) to the extent the content of such Plan violates the proscriptions contained in this section.

6.      Whenever the Post-Petition Agreements require Debtor or Company to deliver a writing to, or serve a writing upon the other, such writing shall be delivered or served upon each as follows:

In the case of Company:                              In the case of Debtors:

Glendon Paulk                                        _____
Diversified Lenders, Inc.                            _____
5607 Avenue Q                                        _____
Lubbock, Texas 79412                                 _____, Texas _____
Phone: (806) 795-7782                                _____@_____.com
Email: gpaulk@divlend.com

                                                             and

                                                     Julian P. Vasek
                                                     Thomas Berghman
                                                     Munsch Hardt Kopf & Harr, P.C.
                                                     500 N. Akard Street, Suite 4000
                                                     Dallas, Texas 75201-6605
                                                     Phone:  (214) 855-7528
                                                     Email:  jvasek@munsch.com
                                                     Email: tberghman@munsch.com

Debtor shall cause its counsel to electronically deliver to Company, each of the following documents  by  no later than two weeks following entry of the proposed Interim Order, or if not yet prepared or filed with the Bankruptcy Court, within two (2) days from the date of filing:

      (i)      The List of Equity Security Holders required by Bankruptcy Rule 1007(a)(3).

      (ii)      The Schedules of Assets and Liabilities required by Bankruptcy Rule 1007(b) as provided by official form number 6.

      (iii)      The Statement of Financial Affairs as required by Bankruptcy Rule 1007(a) and form number 7.

      (iv)      The Statement of Executory Contracts as required by Bankruptcy Rule 1007(b) and official form number 6, schedule G.

      (v)      All real and personal property leases upon which the Debtor either operates or in which the Debtor has possession.

      (vi)     All security agreements, promissory notes, UCC financing statements and guaranty agreements between Debtor and any party-in-interest that holds a security interest or lien on property of the estate.

      (vii)    All Notices of Tax Lien (whether federal, state or local) issued by and/or delivered to Debtor.

      (viii)   Each and every Debtor-in-possession record as required by Bankruptcy Rule 2015(a), as well as any other operating report (i.e., reports that are routinely required to be filed by the courts periodically, usually every month, addressing all financial activity within that time period) required to be filed pursuant to local rules of court.

7.   The Factoring and Security Agreement is further amended as follows:

There is hereby added to section 9.1 the following subsections: (h) any Order entered by the Bankruptcy Court dismissing the Bankruptcy Case, or converting the chapter 11 Bankruptcy Case to a chapter 7 case; (i) any principal of the Debtor either voluntarily or involuntarily ceases to manage the Debtor or otherwise becomes disassociated from the Debtor; (j) the Debtor fails to comply with the requirements contained in the Post-Petition Agreements or any entered Interim or Final Order; or (k) All Post-Petition Obligations due the Company are not repaid in full, without setoff, recoupment or deduction, by no later than the earlier of conversion or dismissal of the chapter 11 case, or, the effective date of any confirmed Plan, unless the Company agrees to and consents, in writing, to other treatment under a Plan.

8.   There is hereby added the following new Section 14 entitled, "Chapter 11 Bankruptcy Provisions" with the following subsections:

      14.1  Debtor shall at all times timely and promptly comply with all substantive and procedural requirements of the United States Bankruptcy Court, United States Bankruptcy Code, United States Bankruptcy Rules and all applicable local rules of court including any administrative orders, including promptly paying all post-petition taxes and other obligations including those required under 28 U.S.C. § 1930(a)(6);

      14.2  The Debtor shall notify Company within 1 day of receiving any documents or correspondence from the IRS, or any state or municipal agency or unit, that Debtor has defaulted on Debtor's post-petition obligations, including, but not limited to, any failure by the Debtor to pay its obligations to the IRS;

14.3 The Debtor shall notify Company within 1 day of receiving any documents or correspondence from any landlord or owner of the Debtor's leased premises (if any) that Debtor has defaulted on Debtor's post-petition rental or lease obligations;

14.4 Debtor shall immediately notify the Company, in writing, of any Event of Default, as that term is defined in Section 9 of the Factoring Agreement (as supplemented by this Rider); and

14.5 Until confirmation of a Plan, neither the Debtor's filing of a Petition with the Bankruptcy Court nor the Debtor's financial condition immediately preceding the filing of its Petition, to the extent that either constitute an Event of Default under the Factoring Agreement, shall constitute an Event of Default under this Post-Petition Agreement.

9.      Section 10.1 of the Factoring and Security Agreement entitled "Governing Law; Venue; Service of Process", or any other provision in the Post-Petition Agreements of a similar nature are modified to provide that during the pendency of the Bankruptcy Case, the Bankruptcy Court shall have jurisdiction to determine any and all disputes arising under or relating to the Post-Petition Agreements, this Rider and any entered Proposed Interim Order and thereafter final order, and that during the Bankruptcy Case, federal bankruptcy law shall be controlling solely to the extent it may expressly override the laws of the State of Texas.

10.      During the pendency of this Bankruptcy Case, Section 3.2 of the Factoring and Security Agreement entitled "Termination " is modified so that the following shall be added as paragraph (f) Company may terminate this Agreement at any time by filing a notice with the Bankruptcy Court on the earlier of:

i.   Twenty (20) days after the entry of the Proposed Interim and Final Orders; or

ii.  Upon the occurrence of any Event of Default and the failure to fully cure each and every monetary and non-monetary Event of Default within three (3) days of receiving notice from Company; or

iii. Immediately upon the Debtor receiving notice from the IRS of the Debtors having committed one or more defaults on its post-petition obligations that may become owing to the IRS.

11.      This Bankruptcy Rider may be executed in counterparts, all of which taken together shall constitute a single document and either Debtor's or Company's signature of this Bankruptcy Rider may either be an original or a facsimile in order to constitute an original signature.

12.      This Bankruptcy Rider shall be binding on and inure to the benefit of the Debtor and the Company, as well as their respective successors and assigns. Moreover, this Bankruptcy Rider shall be binding on any examiner or trustee that may subsequently be appointed, to the extent permitted by law.

13.     All other provisions of the Factoring and Security Agreement shall remain in full force and effect, unless otherwise modified or amended herein.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals, the day first written above.

DEBTOR                                          DIVERSIFED LENDERS, INC.

By:_____                    By:_____
Name:_____                    Name: Glendon Paulk_____
Title:_____                   Title: Chief Operating Officer_____
Dated: _____                    Dated: _____


APPROVED AS TO FORM:


*Counsel for Debtor*

Munsch Hardt Kopf & Harr, P.C.

By:_____
Name:_____
Title:_____
Dated: _____

## PROPOSED INTERIM ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **PEGASO ENERGY SERVICES, LLC** | § | **Case No. 24-42429-mxm11** |
| | § | |
| Debtor. | § | |

**INTERIM ORDER AUTHORIZING DEBTOR TO: (I) MAINTAIN AND CONTINUE
TO OPERATE UNDER FACTORING AND SECURITY AGREEMENT IN ORDER TO
SELL ACCOUNTS POST-PETITION TO DIVERSIFIED LENDERS, INC. PURSUANT
TO 11 U.S.C. SECTION 363(b), (c), (f) AND (m); (II) OBTAIN WORKING CAPITAL
FROM DIVERSIFIED LENDERS, INC. PURSUANT TO 11 U.S.C. SECTIONS 364(c)(1),
(c)(2) & (d)(1); (III) GRANT DIVERSIFIED LENDERS, INC. ADEQUATE
PROTECTION IN THE FORM OF FIRST PRIORITY LIENS AND SECURITY
INTERESTS ON PROPERTY OF THE DEBTOR'S ESTATE PURSUANT TO 11 U.S.C.
SECTIONS 361 AND 363(e); (IV) MODIFY THE AUTOMATIC STAY; AND (V) GRANT
<u>SUCH OTHER RELATED RELIEF</u>**

Upon consideration of *Debtor's Emergency Motion for Interim and Final Orders
Authorizing Debtor to (I) Maintain and Continue to Operate under Factoring and Security
Agreement[1] in Order to Sell Accounts Post-Petition to Diversified Lenders, Inc. Pursuant to 11
U.S.C. § 363(b), (c), (f), and (m); (II) Obtain Working Capital from Diversified Lenders, Inc.*

---

[1] The parties are seeking approval to enable the Debtor to seamlessly continue selling its accounts pursuant to the
Factoring Agreement as supplemented the Rider.

*Pursuant to 11 U.S.C. § 364(c)(1), (c)(2), & (d)(1); (III) Grant Diversified Lenders Adequate*

*Protection in the Form of First Priority Liens and Security Interests on Property of the Debtor's*

*Estate Pursuant to 11 U.S.C. §§ 361 and 363(e); (IV) Modify the Automatic Stay; and (V) Grant*

*such Other Related Relief* (the "**Motion**")[2], the Court hereby makes the following findings of

fact and conclusions of law:

(a)　　On or about April 9, 2021, Diversified Lenders, Inc. ("**Diversified**") and the Debtor entered into a Factoring and Security Agreement[3] which entitled Diversified to, among other things, purchase the Debtor's Accounts[4] arising from the Debtor's sales of goods and/or oilfield services provided to its customers (as amended, supplemented and/or restated, hereinafter, the ("**Factoring Agreement**").

(b)　　The Debtor and Diversified have entered or will enter into a Post-Petition Chapter 11 Bankruptcy Rider to Factoring Agreement ("**Rider**", and together with the Factoring Agreement, the "**Post-Petition Agreements**"), which is subject to this Court's approval.

(c)　　Prior to July 15, 2024 (the "**Petition Date**"), Diversified purchased acceptable accounts receivable (hereinafter, "**Advances**") from the Debtor pursuant to and in accordance with the Factoring Agreement. Diversified asserts it possesses a pre-petition secured claim as of the Petition Date, which amount excludes fees and costs of whatever kind or nature, including attorneys' fees that Diversified is entitled to recover in accordance with the Post- Petition Agreements[5] ("**Pre-Petition Obligations**").

(d)　　Diversified caused to be filed a UCC-1 Financing Statement with the Texas Secretary of State[6] on April 6, 2021 which was assigned Filing No. 26-0013594106.

---

[2] Capitalized terms as used herein shall have the meanings prescribed to them in the Motion, unless otherwise provided herein.

[3] The 2021 Factoring Agreement is intended to serve as both a sale of the Debtor's accounts, in respect to those accounts for which Advances (or purchase price payments) are made by Diversified, and in addition, a security agreement to provide collateral securing the Debtor's monetary and non-monetary obligations and duties of performance which are, likewise, intended to be secured by the assets that serve as Diversified's collateral. Due to this relationship, both the Bankruptcy Code and Rules involving the sale of accounts as addressed by 11 U.S.C. § 363 and post-petition financing and use of cash collateral and adequate protection as addressed by 11 U.S.C. § 364 and 363(c) are applicable.

[4] The term "**Accounts**" as defined in Section 2 of the Factoring Agreement shall have the meanings ascribed by the Uniform Commercial Code ("UCC"). The UCC, as enacted in Texas, defines "Account" to mean "a right to payment of a monetary obligation, whether or not earned by performance, for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; for services rendered or to be rendered…" Tex. Bus. Comm. Code § 9.102.

[5] The "**Post-Petition Agreements**" consist of the 2021 Factoring Agreement and the Rider.

[6] Tex. Bus. Comm. Code § 9.301 provides that "while a debtor is located in a jurisdiction, the local law of that

(e)      Diversified holds an unavoidable, duly perfected first priority ownership interest in pre-petition purchased accounts and an unavoidable, duly perfected first priority security interest in the Collateral, including, but not limited to any non-purchased accounts that serves to secure Diversified's pre-petition secured claim arising under the Factoring Agreement.

(f)      The Debtor and Diversified stipulate that the terms of the Post-Petition Agreements between Debtor and Diversified were negotiated in good faith and at arm's length between Debtor and Diversified and any Advances or other financial accommodations which are caused to be issued to Debtor by Diversified pursuant to the Post-Petition Agreements are deemed to have been extended in good faith, as such term is used in Sections 363(m) and 364(e) of the Code, and Diversified shall be entitled to the full protection of Sections 363(m) and 364(e) of the Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise, but only to the extent that cash collateral is used or financing provided as authorized herein.

The Court makes the following findings regarding the Post-Petition Financing, all subject to a final hearing and opportunity to be heard by all parties in interest, at a hearing to be scheduled as set forth below on **August 6, 2024 at 1:30 p.m.:**

(a)      The Debtor's immediate need to obtain credit pursuant to the Post-Petition Agreements and use Cash Collateral is critical in order to enable the Debtor to continue operations, to minimize the disruption of the Debtor as a "going concern" and to administer and to preserve the value of its estate. The ability of the Debtor to convert its Accounts into working capital, maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise finance its operations requires the availability of the factoring facilities offered by Diversified and the Debtor does not have sufficient available sources of working capital and financing to operate its business or maintain its properties in the ordinary course of business without the factoring facilities;

(b)      The Debtor has moved timely to seek to have this Order approved after filing its petition seeking the relief sought in the Motion. The Court notes that the Debtor set the Motion for an emergency hearing promptly, and that good causes exists to grant the protections to Diversified contained in this Interim Order retroactively to the Petition Date;

(c)      Diversified, the Debtor's pre-petition factor and proposed post-petition factor, is willing to purchase the Debtor's Accounts post-petition and make Advances to the Debtor only upon the conditions contained in the Post-Petition Agreements and this Interim Order;

(d)      Diversified's agreement to enter into and operate under the Post-Petition Agreements and provide factoring facilities to fund the Debtor's required operations is

---

jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." Since the Debtor is a "registered organization" that was organized under the laws of the State of Texas, the Debtor, for the purpose of perfection, is deemed "located" in Texas and the local law of Texas governs the method of perfection.

conditioned upon the Debtor agreeing that the Advances made by Diversified to the Debtor shall be used, in each case, solely in a manner consistent with the terms and conditions of the Post-Petition Agreements, this Order and the Budget (defined below and as the same may be modified from time to time) solely for (1) working capital and other general corporate purposes, (2) permitted payment of costs of administration of the Chapter 11 Case, (3) payment of fees and expenses as approved by the Court.

(e)    It is in the best interests of the Debtor's estate that Diversified be allowed to maintain its pre-petition factoring relationship by entering into the Post-Petition Agreements in order to purchase the Debtor's Accounts, and for Diversified to be permitted to make Advances and other financial accommodations to the Debtor under the terms and conditions set forth herein, to prevent a deleterious impact on the Debtor's business, assets or opportunity to reorganize;

(f)    The purchase and sale of the Accounts and extension of credit under the Post- Petition Agreements is in good faith and Diversified is entitled to the protections afforded pursuant to Bankruptcy Code § 363(m);

(g)    The credit and financial accommodations to be extended under the Post-Petition Agreements are being extended by Diversified in good faith, are fair and reasonable, and Diversified is entitled to the protection afforded pursuant to Section 364(e) of the Bankruptcy Code;

(h)    Under the circumstances, sufficient and adequate notice of the Motion and the hearing with respect thereto has been given in accordance with the Motion and pursuant to Bankruptcy Rule 4001(c) and Section 102(1) of the Bankruptcy Code as required by Section 364(c) and (d) of the Bankruptcy Code, and LBR 4001-1, 5070-1 and 9013-1.

(i)    Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K) and (M);

(j)    This Court has jurisdiction over this proceeding and the parties' property affected hereby pursuant to 28 U.S.C. § 1334;

(k)    Venue for this Bankruptcy Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409;

(l)    Good and sufficient cause exists for the entry of this Interim Order; and

(m)    For the purposes of this Interim Order and subject to a Final Order, granting the relief requested in the Motion, including authorizing the Debtor to sell its accounts receivable and to obtain working capital from Diversified, post-petition in accordance with the Post-Petition Agreements, is necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Accordingly, the requirements under Bankruptcy Rule 4001(b)(2) and (c)(2) have been satisfied for commencing an emergency hearing on the Motion prior to fourteen (14) days after service of the Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Motion is granted subject to the provisions hereof, through and including August 6, 2024.

2.      The Debtor and Diversified are hereby immediately authorized to enter into, and continue to operate under and in accordance with, the Post-Petition Agreements and this Interim Order, and shall further be entitled to execute, deliver, and perform all other documents, instruments, and agreements necessary to effectuate and carry out the terms of the Post-Petition Agreements and this Interim Order, and the Post-Petition Agreements are hereby approved in all respects, *retroactively*, as of the Petition Date, including, but not limited to, pursuant to Sections 363(b)(1), (d), (e) and (f). The Debtor is hereby authorized to sell Accounts to Diversified and Diversified is authorized, in its sole and exclusive discretion, to purchase Accounts and make Advances, overadvances, and to provide any other financial accommodations to the Debtor, after deduction by Diversified of amounts allowed under the Post-Petition Agreements. Diversified shall be the absolute owner of any Purchased Accounts purchased in accordance with this Interim Order and the Post-Petition Agreements, free of any claims and interests.

3.      Expressly subject to Paragraph 23 herein, effective immediately upon the entry of this Interim Order, in respect to any Advances made on or after the Petition Date by Diversified to or for the benefit of Debtor of whatever kind or nature, as well as any other hereafter arising obligations and indebtedness owing to Diversified under the Post-Petition Agreements ("**Post-Petition Obligations**"), the Debtor consents to a modification of the automatic stay and Diversified shall be free from any restrictions and shall be entitled to collect all Accounts directly from any Account Debtor and/or other payors, regardless of whether such Accounts arise from the sale of goods and/or performance of services the Debtor has or hereafter provides to its customers before and/or after the Petition Date. Diversified shall be irrevocably

Interim Order Authorizing Factoring and Security
Agreement and To Incur Credit

6

and unconditionally authorized and is hereby permitted to retain and apply all payments and

Proceeds of any Purchased Accounts purchased by Diversified, to the repayment of Debtor's

Pre-Petition Obligations or Post-Petition Obligations, including, but not limited to, all Post-

Petition Obligations of Debtor arising from the Advances made by Diversified to or for the

benefit of Debtor of whatever kind or nature, in accordance with the Post-Petition Agreements.

Nothing shall prevent Diversified from seeking any additional relief prior to and at the final

hearing on the Motion.

4.      Pursuant to and as authorized by the Post-Petition Agreements and Section 9-406

of the Texas Business & Commerce Code, Diversified is expressly authorized to send and

deliver to any customer of the Debtor (*i.e.*, Account Debtor) one or more written notifications of

assignment in order to notify each such Account Debtor that the Debtor has sold, assigned and/or

transferred to Diversified the right to receive payment due in connection with any present and

future Accounts, and all Accounts shall be payable and paid solely to Diversified as provided in

such written notification of assignment. Debtor is specifically directed, as required by the

Factoring Agreement, before sending any Invoice to an Account Debtor which may or will

constitute a Purchased Account, to clearly state in a manner satisfactory to Diversified that

payment of Debtor's Purchased Accounts and non-Purchased Accounts are assigned and are

factored by and payable exclusively to Diversified.

5.      Except as provided below, the Debtor shall at no time during this Chapter 11 Case

seek to use or be permitted to use any *Cash Collateral*, as defined under Section 363 of the

Bankruptcy Code, to the extent that the source of such Cash Collateral constitutes proceeds of

Purchased Accounts, non-Purchased Accounts or payment intangibles ("**Restricted Cash**

**Collateral**"). The parties agree, however, that prior to any Event of Default under the

Factoring Agreement and Rider ("**Event of Default**"), the following shall not constitute or qualify as Restricted Cash Collateral: (a) Advances that Diversified makes to the Debtor in exchange for purchasing Purchased Accounts from the Debtor, and (b) Account Debtor payments received and collected by Diversified on non-Purchased Accounts and deposited into the Reserve, which Diversified may, in discretion exercised in good faith, elect to remit to the Debtor in accordance with the Post-Petition Agreements, and which Debtor shall be entitled to use subject to the following limitations: for use, (i) only for the purposes specifically set forth in this Interim Order (or other Court orders) and the Post-Petition Agreements, and in compliance with the Budget and (ii) conditioned upon the Debtor, at all times, satisfying its duty to maintain in Reserve the Required Reserve Amount ("**Non-Restricted Cash Collateral**").   Non-Restricted Cash Collateral shall be exclusively subject to the first and senior priority security interest and liens granted to Diversified to secure any Post-Petition Obligations. Notwithstanding the forgoing, following the occurrence of any Event of Default, all Non-Restricted Cash Collateral shall automatically become Restricted Cash Collateral.

6.    The Debtor shall be authorized to use Non-Restricted Cash Collateral (*i.e.*, Advances) in accordance with the terms of this Order and the Budget as defined in Section 7, below.

7.    Attached to this Order as Exhibit "A" is the Debtor's cash flow budget (the "**Budget**"). The Debtor shall timely deliver to Diversified, the United States Trustee, and any committee if appointed, by not later than the fifth (5th) business day of each month, a variance report in a form approved by Diversified, reflecting on a line-item basis, the actual cash disbursements and revenues for the preceding month and the percentage variance (the "**Variance Percent**") of such actual disbursements and revenues from those reflected in the

Budget for that period ("**Variance Report**"). Any disbursement by the Debtor other than for budgeted amounts as set forth in the Budget shall constitute an Event of Default in accordance with the provisions of this Order unless Diversified consents to those changes in writing; provided, however, that the Debtor may only make payments in excess of the total budgeted disbursements so long as the Variance Percent of the aggregate of all actual disbursements shall not exceed ten percent (10%) of the budgeted disbursements.

8.     Pursuant to the Post-Petition Agreements, in the event, notwithstanding that each Account Debtor shall be notified otherwise, the Debtor comes into possession of any proceeds (as that term and any other terms as used is defined by the Uniform Commercial Code) of Purchased Accounts or non-Purchased Accounts (*i.e.*, Restricted Cash Collateral), the Debtor (including any person, insider, or employee of the Debtor, who on behalf of the Debtor, is responsible for managing and/or administering such duties of the Debtor in accordance with this Section) shall immediately notify Diversified of receipt of the payment, hold said payment in express trust for Diversified, keep separate and apart from the Debtor's own property and funds, and by no later than two (2) business days following the date of receipt, deliver said payment to Diversified in the identical form in which received.

9.     Pursuant to the Post-Petition Agreements, and as authorized by Section 364(c)(1) and (d)(1) of the Bankruptcy Code, as security for all Post-Petition Obligations on an interim basis subject to a Final Order, Diversified is hereby indefeasibly granted, a valid, binding, enforceable and perfected first and senior ownership interest in all Purchased Accounts as well as a first and senior priority security interest and lien in all of the following property and assets of Debtor *acquired or arising after* the commencement of the Chapter 11 Case: all of the Debtor's rights, title and interest in and to each of the following, wherever located and whether now or hereafter

existing or now owed or hereafter acquired or arising: Accounts, Chattel Paper, Deposit Accounts, Goods, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Letters of Credit, Commercial Tort Claims, General Intangibles, all policies of insurance, including unearned premiums, Supporting Obligations, the Reserve, all books, records, reports, memoranda, and/or data compilations, in any form (including, without limitation, corporate and other business records, customer lists, credit files, computer programs, printouts and any other computer materials and records) pertaining to any of the foregoing and all proceeds of the foregoing, specifically excluding recoveries from actions brought or recovered pursuant to Bankruptcy Code §§ 506(c), 544, 545, 547, 548, 549, 550, 553, and 724 (collectively, the "**DIP Collateral**"). Notwithstanding the foregoing, other than as set forth herein, the security interest and liens granted to Diversified in the DIP Collateral shall not be made subject to or be made *pari passu* with or to any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any case under Chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, "**Successor Case**"). The security interest and liens granted to Diversified shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case, and/or upon the dismissal of the Chapter 11 Case or Successor Case. No lien or interest avoided and preserved for the benefit of any estate pursuant to Section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the security interest and liens granted to Diversified. No person shall be permitted to seek to interfere with and/or impair, or otherwise seek to enforce any right or privilege that may in any way interfere with and/or adversely affect any of the rights, interests and claims provided to Diversified by the Debtor in respect to any DIP Collateral.

10.     As adequate protection to secure Diversified's Post-Petition Obligations, Diversified is hereby indefeasibly granted, a valid, binding, enforceable and perfected first and senior security interest and liens in all of Debtor's assets acquired or arising on or after the commencement of the Chapter 11 Case (including, without any limitation, DIP Collateral), including, but not limited to, Cash Collateral to the same extent, validity and priority as existed pre-petition, but specifically excluding recoveries from actions brought or recovered pursuant to Bankruptcy Code §§ 506(c), 544, 545, 547, 548, 549, 550, 553, and 724. In no event shall any party interfere with and/or impair, or otherwise seek to enforce any right or privilege that may in any way interfere with and/or adversely affect any of the rights interests and claims provided to Diversified by the Debtor herein and under the Post-Petition Agreements, including but not limited to, Diversified's exclusive rights to retain payment of all Purchased Accounts and non-purchased Accounts.

11.     Pursuant to Section 364(c)(1),(2), and (3) of the Bankruptcy Code, the Post-Petition Obligations shall, except for fees owing to the United States Trustee, also have priority in payment over any administrative expenses or charges that are or may be incurred after the filing of the Petition, including, without limitation, expenses, charges or claims of the kind specified in Sections 503(b), 506(c), and 507(a) and (b) of the Bankruptcy Code (specifically excluding recoveries from actions brought or recovered pursuant to Bankruptcy Code §§ 506(c), 544, 545, 547, 548, 549, 550, 553, and 724).

12.     Diversified shall not be required to file, but is not restricted from doing so, any UCC financing statement(s) or other document(s) with any filing authority to further perfect and/or maintain perfection of such ownership in the Purchased Accounts, or any security interest or lien granted pursuant to the Post-Petition Agreements and this Order, or take any other action

in connection therewith; provided however, that if Diversified, in its sole discretion, shall elect to file any UCC financing statement or other document with respect to such ownership interest in the Purchased Accounts or security interests and liens in the DIP Collateral, the Debtor shall be deemed to have authorized the filing thereof and same shall be deemed to have been perfected at the time and on the date of commencement of this Chapter 11 case, or as of the date of the filing of any previously filed financing statement, whichever is earlier.

13.     Upon the occurrence of any event which would be an Event of Default under the Post-Petition Agreements and/or this Order, the Debtor's right to use any Cash Collateral, including, without limit, Non-Restricted Cash Collateral shall automatically terminate and the Debtor's right to secure further advances from Diversified shall immediately terminate.

14.     In the event of the occurrence of an Event of Default, and immediately upon the filing of a notice of the occurrence of such Event of Default with the Bankruptcy Court, Diversified shall have the right (in addition to all of its other rights under the Post-Petition Agreements) to seek on an expedited basis further order of the Bankruptcy Court granting relief from the automatic stay under Section 362 of the Code authorizing Diversified to pursue any and all rights as described herein and directing Debtor (or any superseding Trustee) to immediately surrender and deliver peaceful possession of all the DIP Collateral to Diversified.

15.     Unless Diversified shall have given its prior written consent, or unless and until the Debtor indefeasibly pays all Post-Petition Obligations and fully satisfies all non-monetary obligations arising under the Factoring Agreement, the Debtor shall not seek, at any time, in this case any further order that authorizes: (i) Debtor's use of Cash Collateral in violation of the provisions of this Interim Order, (ii) the use, sale or lease, other than in the ordinary course of business, of any property of Debtor in which Diversified has any interest, or (iii) the Debtor to

obtain credit or incur any indebtedness that is (A) secured by a security interest or lien in property that constitutes part of Diversified's DIP Collateral or (B) entitled to priority administrative status which is equal or senior to that granted to Diversified herein.

16.     Diversified shall have the right, pursuant to the Post-Petition Agreements and this Interim Order, on reasonable notice to Debtor, at any time during Debtor's normal business hours, to perform a site visit/field examination inspection conducted by Diversified's representatives at the Debtor's locations, at such times and in such frequencies that Diversified may elect, to review Debtor's physical premises, interview its staff or inspect Debtor's books and records and the DIP Collateral.

17.     The failure of Diversified to seek relief or otherwise exercise its rights and remedies under this Interim Order, the Post-Petition Agreements, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

18.     Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, including, but not limited to, any creditor, equity holder or any direct, indirect, or incidental beneficiary.

19.     The Court has and will retain jurisdiction to enforce this Order according to its terms.

20.     If this Interim Order or any of the provisions of this Interim Order are hereafter modified, vacated or stayed, such modification, vacatur or stay shall not affect (a) the validity of the Post-Petition Obligations (as defined in Paragraph 3, above) incurred by Debtor to Diversified prior to the effective date of such modification, vacatur or stay, or (b) the validity or enforceability of any ownership interest of Diversified in any Purchased Accounts and any security interest, lien or priority authorized or created hereby or pursuant to the Post-Petition

Agreements. Notwithstanding any such modification, vacatur or stay, any Post-Petition

Obligations incurred by Debtor to Diversified prior to the effective date of such modification,

vacatur or stay shall be governed in all respects by the provisions of this Interim Order, and

Diversified shall be entitled to all the rights, remedies, privileges and benefits granted herein and

pursuant to the Post-Petition Agreements with respect to all such Post-Petition Obligations, unless

otherwise ordered by the Court.

21.     Pursuant to Bankruptcy Rule 6004(h), the terms of this Order in respect to

authorizing a sale of Debtor's Accounts shall be deemed immediately effective and enforceable

and not stayed.

22.     An Event of Default shall occur if the Debtor seeks any amendment, modification

or extension of this Interim Order without the prior written consent of Diversified, and no such

consent shall be implied by any other action, inaction or acquiescence of Diversified.

23.     Subject to a Final Order, the U.S. Trustee's Office, any committee if appointed, or

any other creditor asserting a lien against the Debtor's pre-petition accounts receivable shall have

up to and not more than sixty (60) days after the entry of a Final Order granting the Motion to

complete an investigation of the facts relating to Diversified's ownership interest in pre-petition

Purchased Accounts, the validity, enforceability, priority of the liens and security interest granted

to Diversified in the Debtor's pre- petition Collateral (as defined in the pre-petition Factoring

Agreement), or the amount of Diversified's pre-petition Claim against the Debtor that arose

before the commencement of the Chapter 11 Case (collectively, "Objection Deadline"). If by no

later than the Objection Deadline one of the categories of parties listed in the preceding sentence

file a motion or commence a proceeding with the Bankruptcy Court contesting, or otherwise

seeking a declaration of Diversified's ownership interest in any pre-petition Purchased Accounts,

the validity, enforceability, priority of the liens and security interest granted to Diversified in the

pre-petition Collateral, including non- Purchased Accounts, or the amount of Diversified's pre-

petition Claim against the Debtor that arose before the commencement of the Chapter 11 Case,

then as of the Objection Deadline all parties shall be deemed to be barred, waived and/or

estopped from: (a) seeking to prevent or impair Diversified's rights to retain payment of any

Purchased Accounts and non-Purchased Accounts, (b) contesting Diversified's ownership

interest in any Purchased Accounts, (c) contesting the validity, enforceability, priority of the liens

and security interest granted to Diversified in any DIP Collateral, or (c) contesting the amount of

Diversified's Claim against the Debtor that arose before the commencement of the Chapter 11

Case.

24.     Notwithstanding anything to the contrary herein, and except as otherwise

provided in this paragraph, the liens and superpriority claims granted to Diversified under this

Interim Order shall be subject to the right of payment of the following expenses (the "Carve-

Out"):

> (a)     fees required to be paid to the Clerk of this Court and to the U.S. Trustee
> pursuant to 28 U.S.C. § 1930; and
>
> (b)     subject to the terms and conditions of this Interim Order, and subject to the
> limits set forth in the Budget, the unpaid and outstanding reasonable fees
> and expenses approved or allowed by order of the Court (including any
> interim fees permitted to be paid under procedures approved by the Court)
> pursuant to Bankruptcy Code §§326, 327, 328, 330, or 331 (collectively,
> the "**Allowed Professional Fees**"), of attorneys, accountants and other
> professionals retained by the Debtor or any committee appointed pursuant
> to section 1102 of the Bankruptcy Code (collectively, the "**Professionals**")
> actually incurred on or after the Petition Date and prior to the filing of a
> notice of the occurrence of an Event of Default with the Bankruptcy Court
> (collectively, the "**Professional Fee Carve-Out**").

Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out, the

proceeds of Advances nor the DIP Collateral, including any proceeds thereof, shall be used to

pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (i) an assertion or joinder in (but excluding any investigation into) any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief (A) challenging the legality, validity, priority, perfection, or enforceability of the Post-Petition Agreements or Diversified's security interests in the DIP Collateral, (B) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Post-Petition Agreements or Diversified's liens on and security interests in the DIP Collateral, or (C) preventing, hindering, or delaying the Diversified's assertion or enforcement of any lien, claim, right or security interest or realization upon any DIP Collateral in accordance with the terms and conditions of this Interim Order; (ii) a request for authorization to obtain Debtor-in-Possession financing or other financial accommodations pursuant to section 364(c) or Section 364(d) of the Bankruptcy Code, other than from Diversified, without the prior written consent of Diversified; (iii) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Diversified or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns; or (iv) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of Diversified or which is contrary, in a manner that is material and adverse to Diversified, to any term or condition set forth in or acknowledged by the Post-Petition Agreements or this Interim Order or which results in the occurrence of an Event of Default under the Post-Petition Agreements or this Interim Order.

25.   Effective upon entry of this Interim Order, no party shall be entitled, directly or indirectly, to charge the Carve-Out, whether by operation of Bankruptcy Code sections 105, 506(c) or 552(b) or otherwise.

**Interim Order Authorizing Factoring and Security Agreement and To Incur Credit**

26.     Nothing contained in this Interim Order shall serve to permit or authorize any Account Debtor to unilaterally modify or extend the terms of payment on Accounts, or otherwise delay remitting timely payment of any Account to Diversified.

27.     If there is any conflict between this Interim Order and the Post-Petition Agreements, the terms and provisions of this Interim Order shall control.

28.     The Debtor, within forty-eight (48) hours following the entry of this Interim Order, shall cause copies of this Order and the Motion, with all attachments, to be served on each of the Debtor's 20 largest unsecured creditors, Diversified, the United States Trustee's Office, secured creditors of the Debtor, and all other parties who are required to be served under Fed. R. Bankr. P. 4001(d), and any other Rules, including the Local Rules of this Court.

29.     Notwithstanding any language set forth in the Factoring Agreement, so long as this bankruptcy case is pending, the United States Bankruptcy Court for the Northern District of Texas shall be the exclusive jurisdiction for all disputes relating to or arising out of this Interim Order, the Factoring Agreement, the Rider, and any other dispute that may arise regarding the terms of this Interim Order or any Final Order. Nothing contained herein modifies or waives the Choice of Law provision set forth in the Factoring Agreement.

30.     This Interim Order is and shall be fully effective upon its entry.

31.     The authorization granted under this Interim Order shall expire on August 7, 2024, at 12:01 a.m. A final hearing shall be held on August 6, 2024 at 1:30 p.m.. Any Objection to the Motion shall be filed with the Court and served on counsel no later than August 1, 2024. In the event no objections are filed by this deadline, the Debtor may submit the proposed final order to the Court and the hearing will be canceled.

32.     In the event the final hearing goes forward, parties may attend the hearing

virtually or in person at Room 128, U.S. Courthouse, 501 W. Tenth Street, Fort Worth, Texas 76102. Audio communication will be by use of the Court's dial-in facility. Parties may access the facility at 1.650.479.3207. Video communication will be by the use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Mullin's home page. The meeting code is 2310-650-8783. Click the settings icon in the upper right corner and enter your name under the personal information setting.  Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Mullin's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.

33.     In the event that the final hearing is, for whatever reason, delayed or continued the expiration date of this Interim Order shall be automatically extended until the final hearing date is scheduled.

### End of Order ###

## EXHIBIT A TO INTERIM ORDER

**Budget**

**[To be filed separately when available]**